IN THE

# SUPREME COURT OF JUDICATURE

OF THE

## STATE OF NEW JERSEY,

### AT JUNE TERM, 1869.

---

#### CHARLES R. CHURCH v. CALEB M. MUIR.

1. A note which is given for property transferred to the drawer, for the purpose of defrauding the creditors of the payee, cannot be enforced in the hands of the payee against the drawer.
2. The rule, both in law and equity, is, that the courts will not lend any aid to the parties, either to undo or to enforce such a fraudulent transaction.

---

This was a case certified from the Circuit Court of the county of Morris.

The facts were these: Under a plea of payment, and notice of set-off, the defendant offered a promissory note, made to him by the plaintiff, and the plaintiff, in disproof of this claim, introduced evidence to show that the consideration of the note was certain chattels transferred to the plaintiff by the defendant, for the purpose of hindering or defeating the creditors of the defendant. The court charged the jury, that if they believed this evidence, a full defence to the note was established.

318

The cause was heard before BEASLEY, C. J., and Justices BEDLE, DALRIMPLE and DEPUE.

For the plaintiff, *H. C. Pitney.*

For the defendant, *J. Vanatta.*

BEASLEY, CHIEF JUSTICE.   The legal proposition in the charge of the judge which is deemed objectionable, is, that a note arising out of a contract designed to hinder or defeat the claims of creditors, was invalid, and could not be enforced in a court of law, between the parties.

On the part of the defendant, in opposition to this view, it was urged, that the statute for the prevention of frauds and perjuries does not invalidate transactions, the end of which is to prevent or make difficult the collection of just claims, except so far as concerns creditors, and that, *inter partes*, such transactions, if containing no other infirmity, will be effectuated at law.

It is certainly true, the statute referred to does not, *proprio vigore*, annul beyond the extent thus defined, the conveyances and contracts at which it is leveled.   Nothing more than this was necessary to effect its purpose, which was the relief and protection of creditors against this class of frauds.   But it is also clear, that it has no tendency to legalize any act which was not legal at the time of its enactment.   So far as respected creditors, it was an authoritative declaration, which removed all doubts, that the contrivances denounced should be inoperative and void, but as to their effect upon the rights of other persons the act is silent.   The result is, that a demonstration that the statute in question does not define the rights of the parties to contracts which are void on account of their hostility to creditors, does not by any means conclude the present inquiry, because the question still remains, how do such contracts stand with regard to the general principles of jurisprudence.

A contract, the purpose of which is to protect a debtor against the just claims of creditors, is an immoral act. Such an affair is inimical to social policy. It is in direct opposition both to the letter and spirit of the·statute for the prevention of frauds. In *Cadogan* v. *Kennett, Cowp.* 434, Lord Mansfield very truly remarked : " That the principles and rules of the common law, as now universally understood, are so strong against fraud in every shape, that the common law would have attained every end proposed, by the statutes 13 *Eliz., ch.* 5, and 27 *Eliz., ch.* 4." And there can be no doubt, that the things prohibited by these statutes, from their inherent unlawfulness, would have been judicially annulled in favor of creditors. But if this is their character, on what ground can a party to one of these transactions ask a court of law to lend its aid to its enforcement ? The general rule undoubtedly is, that courts will not assist a party either to execute or to undo an illegal transaction. If the forbidden agreement has been executed, the parties are left where they have placed themselves ; if it remains executory, its performance cannot be legally compelled. The principle is embodied in the old common law maxim, *ex turpi causa non oritur actio.* The rule has a wide scope, for it takes away all legal help from all contracts, whether under seal or by parol, which stipulate for the performance of an immoral act, or any act contrary to the provisions of a legislative act, or to the public policy of the common law. It is not necessary to refer to adjudications in support of a principle so universally admitted. The only doubt that can possibly be suggested, is, as to its application to a bargain made in fraud of creditors.

In the case of *Nellis* v. *Clark,* 20 *Wend.* 37, Chief Justice Nelson, in a dissenting opinion, endeavored to draw a distinction between what he termed " an illegal contract, in the strict sense of the term, and one fraudulent, as it respects creditors." To the former class he applied the maxim, *ex dolo malo non oritur actio,* but the latter he regarded as regulated by the statute of frauds, and not as altogether

Church v. Muir.

void, but as binding upon the parties. This view is not supported by any cases which bear upon the point, for those to which reference is made are authorities relating to executed and not to executory contracts. But, it seems to me, the defect in the opinion is deeper than the mere absence of decisions which sustain it, because no attempt is made to explain how a contract which is clearly against the policy of the statute of frauds, as well as against the general spirit of the law, is not, in any sense of the term, an *illegal* contract. In their essence and in their effects, such contracts are as immoral and pernicious as many of those which the law has declared to be utterly void. In these respects, how are they to be distinguished from contracts to indemnify persons against the consequences of their illegal acts; against liability for the publication of a libel; from promises by uninterested parties to furnish money for the prosecution of law suits; from agreements in contravention of the bankrupt or insolvent acts, or in general restraint of trade; or from that host of other conventions, which have been so often judicially condemned, not on account of any enormous immorality, but on the score of their inconsistency with public interest and good government? I can see no reason why contracts to defraud creditors should stand on a different footing from the rest of those embraced in the class to which they evidently belong. They are hostile to fair dealing and commercial honesty, and, on this account, should be subjected to the ban of outlawry. The law says to those who embark in such enterprises, in the language of Chief Justice Wilmot, in *Collins* v. *Blantern*, 2 *Wils.* 341, " you shall not stipulate for iniquity, for no polluted hand shall touch the pure fountains of justice." Nor is the principle here indicated a new one in this court. It has been applied in several cases. In *Swayze* v. *Hull*, 3 *Halst.* 54, a note was in suit which had been given by a candidate for political services to be rendered by the payee at an election, and the court said, there can be " no doubt it is a corrupt and void agreement;" and in *Gulick* v. *Bailey*, 5 *Halst.* 87, a like con-

clusion was arrived at with regard to an agreement that the promisee would forbear to offer himself to the postmaster general as a competitor for a contract to carry the mail. The ground of decision in this latter case was defined by Chief Justice Ewing in these words, viz. : " The principles of the law, which compel a court to refuse to enforce a promise founded on such consideration, are very clear, very salutary, and perfectly well established. In *Jones* v. *Randall, Cowp.* 39, Lord Mansfield, and the Court of King's Bench, held that 'many contracts, which are not against morality, are still void, as being against the maxims of sound policy.' In *Blachford* v. *Preston,* 8 *T. R.* 95, Lawrence, J., said : 'A plaintiff cannot recover in a court of justice, whose cause of action arises out of a contract made between him and the defendant in fraud, or to the prejudice of third persons.' "

In *Bishop* v. *Harvey, Penn.* 644, an agreement between constables to take and dispose of goods, on which a landlord had a claim for rent, apply the proceeds towards executions, and be at equal expense in defending themselves against the landlord, was pronounced to be illegal. So a similar view was taken with respect to an agreement to pay money to a constable for service of process, (*Penn.* 624) ; to a note given by an insolvent debtor to his creditor, in consideration of his withdrawing opposition to his discharge, *Sharp* v. *Teese,* 4 *Halst.* 352 ; and to a promise, made by an applicant for a road, to pay certain moneys to a caveator, in consideration of the latter ceasing to oppose the laying of such road. *Smith* v. *Applegate,* 3 *Zab.* 352. That these cases were correctly decided, cannot be doubted ; and it does not seem possible, if we are to be consistent, to apply a different rule of judgment to the case now under advisement. It may be safely said, that in none of the cases cited was the contract which was repudiated more adverse to morality, to statutory policy, or to legal maxims, than is the contract involved in this present action.

But there is also another consideration : the principle on which the cases above referred to are founded, has been

applied, in repeated instances, by our own Court of Chancery, to that very class of contracts now in controversy. The doctrine thus announced has been to the effect that where one party has placed property in the hands of another, for illegal purposes, as for hindering or defrauding creditors, and the latter refuses to account for the proceeds, and fraudulently withholds them, the former must abide by the loss. No one questions this rule as the equitable one. *Baldwin* v. *Campfield*, 4 *Halst. Ch.* 899; *Lewis* v. *Ne'son*, 1 *McCarter* 94; *Smith et al.* v. *Marlatt*, 4 *C. E. Green* 443.

In equity, then, the fraudulent parties are left, as between themselves, in the position in which they have put themselves by their misconduct. Why should a different rule prevail at law? In the present case, there has been a part performance of the illegal arrangement—the goods have been delivered to the one party; the opposite party, in off-setting this note, is seeking the aid of the court to consummate the execution of the agreement. It is settled, in this state, that in equity no such relief would be granted, and, in my judgment, the same result must obtain at law.

The decided weight of authority is in favor of the view thus adopted. *Nellis* v. *Clarke*, 20 *Wend.* 24; *S. C.*, 4 *Hill* 424; *Niver* v. *Best*, 10 *Barb.* 369; *Smith* v. *Hubbs*, 1 *Fairf.* 71; *Jones* v. *Read*, 3 *Dana* 540.

Let the Circuit Court be advised that the instruction to the jury on the point certified, was correct.

Justices BEDLE, DALRIMPLE, and DEPUE concurred.